DWYER & BARRETT, L.L.C.
17 Academy Street, Suite 1201
Newark, New Jersey 07102
(973) 242-3636
Andrew Dwyer (AD-7793)
Email: andy@dwyerbarrett.com
Attorneys for Defendants

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN A. TARZY, ESQ. | : |
| Plaintiff, | : Hon. John F. Keenan, U.S.D.J. |
| v. | : Civil Action No.<br>18-cv-1456 (JFK) (SDA) |
| ANDREW DWYER, DWYER &<br>BARRETT, L.L.C., formerly known as<br>THE DWYER LAW FIRM, L.L.C., | : **DECLARATION OF**<br>**ANDREW DWYER** |
| Defendants. | : |

Andrew Dwyer declares under penalty of perjury pursuant to 28 U.S.C. §
1746 as follows:

    1.    I am the defendant Andrew Dwyer in this action, and I am also a
member of defendant Dwyer & Barrett, L.L.C., formerly known as The Dwyer Law
Firm, L.L.C. As such I am familiar with the facts and circumstances of this matter as
hereinafter set forth, based upon personal knowledge. I submit this Declaration in
support of defendants' motion seeking the following relief: (a) to transfer venue of
this action, pursuant to 28 U.S.C. § 1404(a) to the United States District Court for
the District of New Jersey; and (b) to dismiss with prejudice for failure to state a

1

claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), the First, Second, Third, Fourth, Fifth, Sixth, Eighth and Tenth Causes of Action plead in the Complaint, as well as any claim for punitive or exemplary damages.

A.    **Introduction**

2.    This lawsuit is a fee dispute between attorneys, arising out of an underlying employment discrimination action that I filed. The underlying employment discrimination case I filed was brought on behalf of a New Jersey resident against his former employer, which was headquartered in New Jersey (where my client worked). I filed the action in the New Jersey Superior Court, Law Division, Hudson County. The case was then vigorously litigated for over three-and-a-half years in the New Jersey trial and appellate courts. On the eve of a second trial date in New Jersey, the case finally settled for ▮▮▮▮▮▮ Plaintiff Alan Tarzy never made an appearance in the case, and never lifted a finger to assist the litigation in any fashion. Indeed, Mr. Tarzy is not (and never has been) admitted to practice in New Jersey, and he would have been unable to pursue the case without New Jersey counsel. He never participated in the three-and-a-half year long lawsuit at all.

3.    Nonetheless, Mr. Tarzy has filed this action, seeking ▮▮▮▮▮▮ in attorney's fees. He bases this claim on an alleged oral agreement to split fees. Even if the agreement existed as Mr. Tarzy claims, it would be unlawful and void under New Jersey law (and under New York law, incidentally). Mr. Tarzy knows this, which is why he has added to his "breach of contract" claim a series of claims alleging various kinds of fraud, or sounding in quasi-contract. However, all the

2

alleged acts that constitute an alleged breach or other alleged violation occurred in New Jersey, because the entire locus of operative facts for this dispute occurred in New Jersey. Indeed, the ███████████in disputed fees is sitting in my attorney trust account in a bank in New Jersey, where it has been for over a year.

4.     As we set forth below, almost all of the events relevant to plaintiff's claim took place in New Jersey. Most of the relevant witnesses reside in New Jersey, or in other districts, but Mr. Tarzy is the only relevant witness residing in the Southern District of New York. The incredibly voluminous mountain of documents related to this case all are present in New Jersey. Mr. Tarzy literally has no file pertaining to this case at all. The governing law is New Jersey law, because the putative "contract" is one for legal services performed in New Jersey, and therefore this lawsuit concerns New Jersey's regulation of attorneys practicing law within its borders. The "center of gravity" in this case is entirely in New Jersey. Indeed, the only significant connection between this suit and the Southern District of New York, is that apparently Mr. Tarzy lives there.

5.     In sum, given the overwhelming connection between this litigation and the District of New Jersey, as detailed below, the relevant considerations strongly favor granting plaintiff's motion and transferring this case to the District of New Jersey.

**B.     The Underlying New Jersey Litigation**

6.     This dispute over attorney's fees arises out of a religious discrimination case I filed in New Jersey, captioned ███████████████████████████████████  ██████████████████████. I filed the suit on June 24, 2013. The case

essentially alleged that Mr. ▓▓▓▓ was fired from his job on with ▓▓▓▓ on January 29, 2013, because he is Jewish, which would constitute unlawful religious discrimination in employment under the New Jersey Law Against Discrimination, N.J.S.A 10:5-1 et seq.  (My law practice is entirely devoted to representing employees bringing statutory claims for discrimination, harassment and retaliation.)

7.      Shortly after filing and serving the lawsuit I was contacted by an attorney, ▓▓▓▓▓▓▓ who was a partner at a firm called ▓▓▓▓▓▓▓▓▓▓ based in Chicago, Illinois (where Mr. ▓▓▓▓ worked).  Mr. ▓▓▓▓ told me he would be representing defendants in the case.  Mr. ▓▓▓▓ informed me that during his employment Mr. ▓▓▓▓ had signed something called a "Dispute Resolution" form. Mr. ▓▓▓▓ advised he believed this constituted a binding agreement to arbitrate any employment claims, and consequently Mr. ▓▓▓▓ suit had to be dismissed in favor of arbitration.  I was not aware of this form until Mr. ▓▓▓▓ called it to my attention. Apparently, my client had not realized he had signed such a document when he was hired.

8.      Fortunately, I had a great deal of experience in litigating the validity of arbitration agreements applied to employment claims.  Among other things, I was counsel for plaintiff in Garfinkel v. Morristown Obstetrics, 168 N.J. 124 (2001), which was the first decision of the New Jersey Supreme Court addressing the validity of arbitration agreements under New Jersey law.  I believed the "Dispute Resolution" form could be successfully challenged and I would be able to keep the case in New Jersey state court, where Mr. ▓▓▓▓ would have the benefit of a jury trial.

9.      Mr. ████████ understandably, disagreed.  He filed a motion to dismiss, which was heard in the New Jersey Superior Court, before the Hon. Mary K. Costello, P.J.S.C., on November 8, 2013.  Presiding Judge Costello granted the motion and dismissed the case.

10.      I still believed we could win this issue and so I filed an appeal to the New Jersey Appellate Division.  This appeal took nearly two years.  Finally, on September 1, 2015, the Appellate Division issued its ruling.  It reversed the trial court, restored the case, and sent it back to the trial court for further proceedings.

11.      Once back in the trial court, Presiding Judge Costello set very tight deadlines for completing all discovery (including expert discovery) by July 3, 2016. (No discovery had taken place because of the defendants' motion to dismiss.)  She also set a trial date of September 14, 2016.

12.      Over approximately the next nine months, the parties engaged in fierce, intense litigation.  Over 10,000 pages of documents were exchanged in discovery.  Eight witnesses were deposed, some on multiple days, producing several thousand pages of transcript.  Both parties retained experts and there was extensive expert discovery (regarding economic damages).  The parties made well over 20 separate discovery motions, and filed two interlocutory appeals (one by plaintiff, which was granted, and one by defendants, which was withdrawn). Defendants, of course, filed a massive summary judgment motion, and we filed an equally massive response (defendant's motion was denied in its entirety).

13.      The file in this case ultimately became massive.  It is all still in my office.  Most of it is *not* in electronic format.  The file occupies multiple file cabinets.

If the file were stacked up end to end, it would come to approximately 38 feet.  Most of this file is *not* in any electronic format.

14.    The parties finally showed up for the scheduled trial date in September, 2016.  Each side filed several in limine motions, and raised a host of procedural and evidentiary disputes.  There were approximately 280 pre-marked trial exhibits.  The court began the trial, and tried to engage in jury selection, but after several days, literally gave up.  The court concluded the trial was going to take so long (possibly a couple months) that it would be impossible to pick a jury at that time, and the trial was adjourned to January 30, 2017.

15.    Before the next trial date, however, the parties entered into an intense mediation process, and in early January, 2017, reached an agreement to settle the case for ███████ This settlement was finalized in a formal, written settlement agreement, on January 25, 2017, just a few days before the adjourned trial date.  The Settlement Agreement specifically says it is governed by New Jersey law, and that any disputes concerning the Settlement Agreement would have to be brought in a court of competent jurisdiction located in New Jersey.

16.    We came a long way to reach that outcome.  When my client was initially fired in January, 2013, he was **offered a severance package of** ███████, in exchange for waiving his right to sue.  (He didn't sign.)  During the litigation, we never received an offer from defendants until August, 2016, after the summary judgment motion was denied.  It was only ███████ We fought our way back from a dismissal in favor of arbitration, and ultimately produced an outstanding result for our client.  Indeed, to my knowledge, Mr. ███████ was the only person to file an

employment lawsuit against ▆▆▆▆▆ we obtained discovery of other employees' assertion of claims, and none of them filed suit, probably because of the "Dispute Resolution" form). Of course, I didn't do it alone. My law partner, La Toya Barrett, and our legal assistant, John Ellis, actively participated in the litigation.

17.     But one person who did not help at all was Alan Tarzy.

**B.     Plaintiff Tarzy's Complete Failure to Contribute to the Litigation**

18.     Alan Tarzy never made an appearance in the ▆▆▆▆ litigation. He is not admitted to practice in New Jersey, and he never was admitted. He never sought to be admitted pro hac vice. He never attended a single court appearance or the mediation. He never attended a single deposition. He never attended any event in the case, not even as an observer (nor did he ever express an interest in doing so). He never communicated once with Mr. ▆▆▆▆ (counsel for ▆▆▆▆▆▆). He never participated in preparing any discovery requests, or in preparing any discovery responses. He never drafted a single document for the case, not even a letter. He never helped respond to any issue raised in the case. He never participated in settlement talks. He never helped prepare Mr. ▆▆▆▆ for his three day deposition, nor did he help prepare for anything else. He never even expressed an interest in even reading any of the thousands of documents that were being generated in the case.

19.     During the course of the litigation, of course, my office incurred various out of pocket costs we had to cover. Our client could not afford to cover these costs. In the end, they came to over ▆▆▆▆▆. While we were fronting these costs throughout the litigation, Mr. Tarzy never offered to pay even one dime to help.

**C.    Plaintiff Tarzy's Referral of the ▓▓▓ Litigation to Defendants,**
**And He Subsequent Lack of Involvement in the Litigation**

20.    The one thing Mr. Tarzy did was refer the ▓▓▓ matter to our office. After Mr. ▓▓▓ was fired on January 29, 2013, he signed a retainer agreement with Mr. Tarzy, dated February 1, 2013.  This was a one-third contingency arrangement. A copy of this retainer is annexed hereto as **Exhibit A**.  Mr. Tarzy had Mr. ▓▓▓ sign this agreement, even though Mr. Tarzy was not authorized to practice law in New Jersey.  Again, at the **time Mr.** ▓▓▓ resided and worked in New Jersey, and his former employer was headquartered in New Jersey.

21.    Mr. Tarzy told me he attempted to negotiate some kind of settlement on behalf of Mr. ▓▓▓, to get him more money than the ▓▓▓ offered in his proposed severance agreement.  I have no idea whether Mr. Tarzy is being truthful about this or not.  I know the severance agreement was never changed and Mr. ▓▓▓ was never offered more money.  I also know (from discovery) that there is no document anywhere in ▓▓▓ files reflecting any contact from Mr. Tarzy. ▓▓▓ also produced several privilege logs in discovery.  None of those privilege logs ever reference any communication with Mr. Tarzy.  So it is an open question whether Mr. Tarzy ever actually spoke with anyone at ▓▓▓ about Mr. ▓▓▓

22.    In fact, when I was first getting involved in the case I asked Mr. Tarzy for a copy of his file.  He said he had no file at all, other than a copy of Mr. ▓▓▓ severance agreement (which I already had from Mr. ▓▓▓.  He said his communications with ▓▓▓ were all by phone and he had nothing in writing.  A copy of this email exchange is annexed hereto as **Exhibit B**.

8

23.    Whether or not Mr. Tarzy did anything at all for Mr. ▓▓▓▓h early 2013, in June, 2013, he reached out to me. I have no idea how he learned of my existence. I did not know him previously. We spoke on the phone on June 4, 2013 (I was in my office in New Jersey, presumably Mr. Tarzy was in New York). We briefly discussed Mr. Tarzy's understanding of the facts of the case (his understanding was pretty skeletal). I agreed to meet Mr. ▓▓▓▓ in Mr. Tarzy's office on June 13, 2013. During the June 4, 2013 phone call, we only discussed the facts of the case, and arranged to meet. There was no discussion about fee-splitting. (Mr. ▓▓▓▓ was not on the call.) I kept handwritten notes of the June 4, 2013 phone call with Mr. Tarzy, which are annexed hereto as **Exhibit C**.

24.    Mr. Tarzy sent me an email shortly after the call, giving me his contact information, and confirming the June 13, 2013 meeting with Mr. ▓▓▓▓. A copy of that email is annexed hereto as **Exhibit D.**

25.    I immediately began researching ▓▓▓▓. I learned that while they were headquartered in New Jersey, they were about to be acquired by another company, and the acquisition would be effective June 25, 2013. This was important strategically. As a company with headquarters in New Jersey, if I sued them in New Jersey state court, they would be unable to remove to federal court. If, on the other hand, they were acquired by a non-New Jersey corporation, and thus lost their status as a New Jersey "citizen" for purposes of removal jurisdiction, then they would be able to remove the case into federal court. Because it is generally much more advantageous for New Jersey plaintiffs in employment cases to be in state

court, I realized we were under a deadline to file suit before June 25th. A memo to the file I prepared on this point is annexed hereto as **Exhibit E**.

26.     On June 13, 2013, I went to Mr. Tarzy's office to have the intake meeting with Mr. ▆▆▆▆. The meeting lasted for a couple hours, and we went over the facts of Mr. ▆▆▆▆ potential case in detail. Contrary to Mr. Tarzy's claim, we did not discuss fee splitting, or any other fee arrangement, at all during this meeting. Again, I kept my notes from the meeting, and they are annexed hereto as **Exhibit F**. (Mr. Tarzy did not take any notes during the meeting.)

27.     The following Tuesday, June 18, 2013, Mr. Tarzy and I spoke on the phone about Mr. ▆▆▆▆ matter again. We agreed we would work on the case together, with me doing the majority of the work, but with Mr. Tarzy actively participating. Based on the idea that we would both work together, we said we would split the fees. We did not memorialize anything in a written agreement. Mr. ▆▆▆▆ was never a party to this call.

28.     Again, there was no discussion about fee splitting or any fee arrangement in front of Mr. ▆▆▆▆ on June 13, 2013, when we had the intake meeting. In fact, Mr. Tarzy's own complaint, purporting to quote from an email, shows the discussion occurred in a "phone discussion from Tuesday," which was June 18, 2013, the day before the email was sent. A copy of this email is annexed hereto as **Exhibit G**. The court will note Mr. ▆▆▆▆ is *not* copied on this email.

29.     In the June 18, 2013 phone call, Mr. Tarzy asked about receiving a referral fee. I explained to him I could not do that because it would be unethical under New Jersey law. (It's also unethical under New York law.) Unless an attorney

is a certified civil trial attorney (and I am not), that attorney cannot pay anyone a referral fee, ever. I explained that to Mr. Tarzy, and I explained I was not a certified civil trial attorney, and so I could never pay him a referral fee.

30. Under both New Jersey ethics rules and New York ethics rules, two attorneys from different law firms can split fees on a case, ***but only if the fee split is in proportion to the services performed by each lawyer***; the total fee does not exceed reasonable compensation for all legal services they rendered to the client; and the client is notified of the fee split and consents to having both lawyers involved, ***in writing***. If the fee split is not in proportion to the services performed by each lawyer, then both lawyers have to assume "joint responsibility" for the case, and the fee split has to be memorialized in a ***written agreement with the client***. New Jersey R.P.C. 1.5(e); New York RPC 1.5(g).

31. Mr. Tarzy claims he did not know what New Jersey ethics rules required, but presumably he knew what New York ethics rules required, since he is admitted to practice law in New York. New York does not allow for a pure "referral fee." Instead, under both States' ethics rules, any "fee sharing" between attorneys who are not in the same law firm is governed by RPC 1.5. And under either State's rules, it would be impermissible to have a fee split with Mr. Tarzy doing no work, unless there was a ***written agreement with Mr.*** ████████ consenting to the fee split. And, as Mr. Tarzy knew, there was no such agreement with Mr. ██████

32. Reading the Complaint, one must wonder whether Mr. Tarzy is, indeed, familiar with his own State's ethics Rules. In an attempt to show the 60/40 fee splitting arrangement would have been permissible under New York law, the

Complaint cites "The New York Rules of Professional Responsibility, Rule DR
107(A)(a)(1)." Complaint, ¶ 10. We assume this is an attempt by Mr. Tarzy to refer
to DR 2-107 of the old New York Code of Professional Responsibility. However, the
New York Code of Professional Responsibility was replaced in 2009 by the New
York Rules of Professional Conduct (as New York became the last state to abandon
the format of the old ABA Model Code of Professional Responsibility).
Consequently, DR 2-107 no longer exists, and was not in existence in 2013, either.
In New York, fee sharing among attorneys who are not in the same firm is now
governed by RPC 1.5(g). Like its New Jersey analog (NJ RPC 1.5(e)), the New
York RPC 1.5(g) prohibits fee sharing unless memorialized in an agreement with the
client, *in writing*. Mr. Tarzy does not allege he was somehow unaware there was
no written agreement with Mr.████████regarding fee splitting. If Mr. Tarzy is claiming
he was "tricked" because he did not know his own State's Rules of Professional
Conduct, that would be quite a startling admission. (Incidentally, under the old DR
2-107, splitting fees in any fashion other than "in proportion to the services
performed by each lawyer" would also have to be memorialized in an agreement
with the client, so the alleged "agreement" described in the Complaint would have
been invalid under DR 2-107 as well.)

33.     I subsequently entered into a contingency retainer agreement with Mr.
████████ but Mr. Tarzy was not a party to this agreement.

34.     I quickly drafted the complaint to file suit, in light of the looming June
25, 2013 deadline. I provided the draft to both Mr. Tarzy and Mr.████ Mr.████
had several comments and proposed edits, but Mr. Tarzy had nothing to contribute.

Nonetheless, I put both my firm's name and Mr. Tarzy's firm's name on the complaint, because I assumed Mr. Tarzy was going to actively participate in the case, as we had agreed. I assumed that once the case was filed, Mr. Tarzy would ask to be admitted pro hac vice and enter an appearance in the case.

35.    As noted, shortly after the complaint was filed, I was approached by Mr. ████, ████ attorney, who told me about the "Dispute Resolution" form and his contention that the case had to be dismissed in favor of arbitration. Mr. Tarzy, frankly, seemed to lose interest in the case at that point. Although I copied him on several emailed communications, both with Mr. ████ and with defense counsel, Mr. Tarzy never responded to anything, nor provided any input.

36.    In the months that followed the filing of the complaint (and then the initial dismissal of the action in November, 2013), I received almost no communications from Mr. Tarzy. He never called my office, and after the complaint was filed in June, 2013, he never replied to any of the dozens of emails I copied him on. I never saw Mr. Tarzy in person, and never again went in person to his office, except for one time when he asked me to meet with another potential client. This meeting had nothing to do with Mr. ████ (That prospective case never went anywhere. I didn't think the client had a claim.) My one and only in person meeting with Mr. Tarzy regarding Mr ████ was the initial intake meeting in June, 2013.

37.    Because Mr. Tarzy never responded in any fashion to the numerous emails I was copying him on, eventually I stopped copying him on every communication. It was apparently pointless, because it appeared he had no interest in being involved in the case, even peripherally.

38.    In May, 2014, while the appeal was pending, Mr. ██████ reached out because he was thinking about settling and putting the case behind him.  I arranged for a telephone conference call between myself, Mr. ██████ and Mr. Tarzy, which took place on June 1, 2014.  During the call I went over in detail the strength of the still pending appeal, the pros and cons of settling the case, the likely valuation of the case from defendants' perspective, tax issues and the like.  Mr. Tarzy presumably listened during the conversation, but he said almost nothing beyond pleasantries, and he contributed nothing to the discussion.  Mr. ██████ said he would think about it.  The next day, he sent an email authorizing me to make a settlement demand of ██████ which I promptly did (via phone to one of the defense attorneys).  Defendants did not respond to our proposal, however.  Although Mr. Tarzy was copied on these communications about settlement, he made no response and contributed nothing.

39.    A few months later, in late September, 2014, the New Jersey Supreme Court rendered a decision in another arbitration case, invalidating the arbitration clause.  I felt strongly this decision guaranteed we would win our appeal, which would substantially increase the value of the case.  I immediately notified Mr. ██████ and I urged him to authorize me to withdraw the ██████ settlement demand we previously made.  He authorized me to do so, and I withdrew the demand.  Again, Mr. Tarzy was copied on these emails, but his only contribution was to agree with my advice.

40.    I was correct in my prediction that we would ultimately win our appeal, although it took almost another year of waiting before this finally happened, in

14

September, 2015.  Again, I resumed copying Mr. Tarzy on various email communications, but again he never responded to or expressed an interest in **anything.**

41.    Even after we won the appeal and we were sent back to the trial court for discovery and trial, I kept copying Mr. Tarzy on email communications, both with Mr. ████ and with defense counsel.  Once again, however, Mr. Tarzy never responded to anything.  It was apparent he had no interest in actually doing any work for the lawsuit.  I did not continue to copy him on each and every email, because there just seemed no point.

42.    In July and August, 2016, I wrote a couple emails directly to Mr. Tarzy, to let him know about the status of the case.  In the first email, I informed him that we were waiting resolution of the summary judgment motion, but that we (i.e., Mr. ████ and myself) felt there was no point in entering mediation with defendants while the summary judgment motion was still pending.  Mr. Tarzy's only response was to write back and say he agreed with me.

43.    Later, in August, 2016, I emailed Mr. Tarzy to let him know the summary judgment motion was denied, to remind him about the upcoming trial date, and to update him on settlement talks.  He had no response.

D.    **The Dispute With Plaintiff Tarzy Over Attorney's Fees From the** ████ **Case**

44.    When we appeared for the first trial call in September, 2016, the trial judge attempted to hold settlement talks with the parties.  While those discussions

15

ultimately did not produce a result, there was a promising indication that settlement was not hopeless.

45.    Given that, I felt obliged to reach out to Mr. Tarzy to let him know the case might settle, although I had no specific numbers to offer. I wanted to find out from him what kind of fee he thought he was entitled to, based on his contributions to the case. I was quite shocked when he informed me he believed he was entitled to a flat 40% of the fees from the case, even though he had performed almost no services for the case whatsoever.

46.    I reminded Mr. Tarzy that it was not permissible to pay him a referral fee, and that it was not permissible to have a flat percentage split, absent a written agreement with the client. I emphasized these were ethical rules we were obliged to follow. Mr. Tarzy was very angry and insisted that he was entitled to 40%, no matter what. I told him that at the moment there was nothing to decide because we did not have a settlement, but I promised him that I would not settle the case behind his back.

47.    As noted, in early January, 2017, Mr. ███ and ███ reached an agreement on a total settlement figure of ███ via mediation. Understandably, ███ was very concerned about maintaining the confidentiality of the settlement. I alerted Mr. ███ to the potential fee dispute with Mr. Tarzy, because I felt obliged to insure that Tarzy did not raise some kind of dispute that would derail the settlement (e.g., threaten to sue ███ for additional fees). After some communications back and forth, Mr. ███ agreed to authorize me to disclose the settlement amount to Mr. Tarzy, along with a draft settlement agreement. The

idea was to have Mr. Tarzy sign the settlement agreement and specifically agree to two conditions: (a) he would not breach confidentiality of the settlement, and (b) he would not sue ▇▇▇▇ for additional fees. In exchange, I would agree to put the disputed fees ▇▇▇▇▇▇▇ into my escrow account, and keep it there until either we agreed on how it would be divided, or until the issue was resolved by a court order.

48.    This solution would ensure that Mr. Tarzy's position would not be compromised – the full amount of the fees he was claiming would be kept in escrow, and he could litigate over his entitlement to those fees. But it would also allow Mr. ▇▇▇▇ settlement to go forward, because ▇▇▇▇ would have the reassurance that confidentiality would be maintained. I was concerned with the looming trial date of January 30, 2017, and I was worried that the settlement could fall apart if we could not get this resolved somehow before then.

49.    On January 19, 2017, when I explained to Mr. Tarzy I would disclose the settlement amount to him, he agreed he would keep it confidential. However, after I sent him the draft settlement agreement, he essentially stopped communicating with me. He would not agree to maintain confidentiality, nor would he agree not to sue ▇▇▇▇, nor would he agree to preserve the disputed funds in my escrow account. He did not respond to my repeated emails nor take my phone calls. He finally called me back on January 23, 2017, but would only say he would "think about" the proposal to allow Mr ▇▇▇▇ settlement to go forward.

50.    Ultimately, ▇▇▇▇ attorneys decided to move forward with the settlement, even without Mr. Tarzy's agreement to maintain confidentiality. To give

███████ added reassurance (and thus insure Mr. ███████ settlement did not fall apart), I agreed to keep the disputed funds in escrow until the dispute was resolved, and I agreed to indemnify ███████ for any claims Mr. Tarzy might make against ███████ for attorney's fees from the case.

51.    Meanwhile, Mr. Tarzy retained a New Jersey attorney to represent him, named Edward Kasselman.  Mr. Kasselman said he was going to sue me, imminently.  He further stated he was not promising to keep anything about the settlement with ███████ confidential.  It was apparent from Mr. Kasselman's communications that Mr. Tarzy had disclosed all the information about the settlement to Mr. Kasselman, notwithstanding his previous promise to keep the settlement confidential.

52.    Despite this, in order to protect my client, I continued to work with ███████ attorneys, to reach some kind of tripartite agreement with Mr. Tarzy's lawyers that would allow the parties to resolve the dispute yet maintain confidentiality of the settlement in the underlying ███████ lawsuit.  This dragged on for months, but went nowhere.

53.    Based on his prior threats, I fully expected Mr. Tarzy's attorney (Mr. Kasselman) to sue me at any moment over the disputed fees.  But months went by and nothing happened, and I never heard anything further from them.  The entire time I continued to keep the disputed attorney's fees in my trust account in New Jersey.

54.    Finally, in early February, 2018 (a year after the Settlement Agreement in the ███████ matter), I reached out to ███████ attorney, Mr. ███████ and let

18

him know I was going to pursue the matter by raising it again with Kasselman/Tarzy, and if I could not get anywhere, I was going to file suit. Again, in the interest of protecting my client, I wanted to insure ███████ was not going to raise any issues regarding confidentiality that would create a problem for Mr. ██████ Ultimately Mr. ████████ said he had no problem with me proceeding as long as I continued to comply with the confidentiality provisions in the Settlement Agreement.

55.     I then reached out to Mr. Kasselman to find out if his client was still asserting his claim to the fees. Mr. Kasselman said he was no longer representing Mr. Tarzy, although he might represent him again in the future. He authorized me to reach out to Mr. Tarzy directly.

56.     I then reached out to Mr. Tarzy via email on February 7, 2018. I asked him to tell me if he was still asserting his claim to the fees or not. I explained that if I did not hear from him within a week, I would file suit against him.

57.     Mr. Tarzy did not respond to my email. Instead, in what was clearly designed as a "race to the courthouse," he hired a new lawyer and filed suit against me first, on February 14, 2018, in New York State Supreme Court. The plain goal was to prevent suit from being brought in New Jersey. I was served with the complaint on February 16, 2018.

58.     In drafting his complaint in this lawsuit, Mr. Tarzy and his attorneys deliberately and gratuitously included in the body of the complaint a specific reference to the ████████████ case, and specifically recited the amount of the settlement. This was completely unnecessary for filing suit, and needlessly exposed Mr. ███████ to liability, in the event ████████ attorneys decided to blame Mr. ████████ for

the breach of confidentiality. Mr. Tarzy and his lawyers made no effort to redact this information from the complaint, use a pseudonym, or file the complaint under seal.

59.    Thanks to this foolishness, the lawsuit filed by Mr. Tarzy was picked up by Law 360, an online publication, which published an online article about the suit, specifically reciting the settlement between Mr. ████ and ████. A copy of this article is annexed hereto as **Exhibit H**.

60.    On February 17, 2018, I filed the notice of removal, removing Mr. Tarzy's lawsuit to this court.

E.    **Every Relevant Factor Under 28 U.S.C. § 1404(a) Favors Transferring This Case To The District Of New Jersey**

61.    Case law has developed a number of factors to consider on a motion to transfer venue filed pursuant to 28 U.S.C. § 1404(a). Each of those factors favors transferring venue to the District of New Jersey in this case.

62.    First, the locus of operative facts overwhelmingly favors litigating this case in the District of New Jersey. Almost every event relevant to this case took place in New Jersey. The underlying lawsuit was filed in New Jersey, on behalf of a New Jersey resident, against a corporation headquartered in New Jersey, where the plaintiff had worked. The suit that gave rise to this dispute was litigated heavily in the New Jersey court system for three-and-a-half years. The ultimate Settlement Agreement that gave rise to the disputed attorney's fees resolved the New Jersey suit, and the Settlement Agreement expressly states it is governed by New Jersey law and is to be enforced in the New Jersey courts. To the extent this suit raises confidentiality concerns for ████ that would impel it to enforce the Settlement

20

Agreement, if this case were not transferred, it could result in ancillary litigation in multiple forums. All of the alleged "breaches" and wrongdoing stated in the Complaint took place in New Jersey. The disputed funds themselves are still deposited in a trust account in New Jersey.

63. The fact that the ███████████ litigation took place entirely in New Jersey, over such a lengthy period of time, is particularly relevant, because under New Jersey law, the only potential claim Mr. Tarzy has is one for quantum meruit. Consequently, the key factor for determining what damages, if any, can be claimed by Mr. Tarzy, is what work was performed in the ███████████ litigation, which took place entirely in New Jersey.

64. The only "New York connection" for this entire dispute is the one intake meeting that happened on June 13, 2013. All of the other events that gave rise to this dispute took place in the course of the New Jersey litigation. New Jersey is the "center of gravity" for this dispute.

65. Second, most of the important witnesses for this case are in New Jersey. The key witnesses in this case are people who are able to testify as to what work was performed for the underlying litigation – because that is the key to the quantum meruit claim being advanced by Mr. Tarzy. Aside from myself, La Toya Barrett and John Ellis are also capable of testifying first hand about the extensive work performed for the underlying lawsuit in New Jersey. Both Ms. Barrett and Mr. Ellis work and reside in New Jersey.

66. ███████████ would also be able to testify as to the work performed on the underlying lawsuit. He resides presently in the Eastern District of New York, so

he is neither in the Southern District nor in the District of New Jersey. However, he would be subject to subpoena power to testify under Fed. R. Civ. P. 45(c)(1)(A) anyway. Also, upon information and belief, I do not believe Mr. ██████ would object to coming to New Jersey to testify, if need be.

67.    The only material witness who actually resides in the Southern District of New York is Mr. Tarzy himself. It is not unreasonable to ask him to travel to New Jersey, when he is attempting to claim over ██████ from a lawsuit that was entirely prosecuted in New Jersey.

68.    Third, the massive amount of documents related to this case are all located in New Jersey. Given the vast size of the underlying case file, litigating this case outside New Jersey would impose a burden. By contrast, it appears Mr. Tarzy does not have any physical file at all.

69.    Fourth, Mr. Tarzy cannot credibly argue he would be put to any unreasonable inconvenience if he were to litigate this case in New Jersey. Indeed, he originally retained New Jersey counsel when this dispute first arose, and was planning on filing suit in New Jersey.

70.    Fifth, all of the asserted claims arise under New Jersey law, because all of the alleged breaches occurred in New Jersey, and the performance of the alleged "contract" that is the cornerstone to Mr. Tarzy's claims all occurred in New Jersey. Consequently, the District of New Jersey would be best familiar with the governing law.

71.    Sixth, the weight that might normally be afforded to Mr. Tarzy's choice of forum is diminished for a few reasons. First, the plaintiff's choice of venue is

given much less weight where, as here, the locus of operative facts has only a tenuous relationship with the chosen venue. Second, the plaintiff's choice of venue was clearly the result of a "race to the courthouse," once Mr. Tarzy realized he was about to be sued in New Jersey.

72.    Finally, trial efficiency and the interests of justice favor transfer, particularly when New Jersey's connection to the case is so strong, and the connection to the Southern District of New York is so weak. In addition, while congested dockets are not usually a major factor, it is nonetheless true that this factor favors transfer. According to the latest report of the Administrative Office of the U.S. Courts, in the Southern District of New York, 19.1% or 2,379 civil cases are over three years old, while in the District of New Jersey the corresponding figures are only 4.1% or 690 cases. A copy of the relevant excerpts from the Administrative Office's report is annexed hereto as **Exhibit I**.

73.    For the foregoing reasons, we respectfully submit the motion to transfer venue should be granted.

Executed on March 9, 2018

ANDREW DWYER