UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALAN A TARZY, ESQ.

    Plaintiff,

v.

ANDREW DWYER, DWYER &
BARRETT, L.L.C., formerly known as
THE DWYER LAW FIRM, L.L.C.,

    Defendants.

Hon. John F. Keenan, U.S.D.J.

Civil Action No.
18-cv-1456 (JFK) (SDA)

**DECLARATION OF
ALAN A. TARZY**

---

    ALAN A TARZY, declares under penalty of perjury pursuant to 28 U.S.C. §1746 as follows:

    1. I am the plaintiff in the above captioned action. I submit this declaration in opposition to the motion of defendants ANDREW DWYER and DWYER & BARRETT, L.L.C. ("hereinafter collectively referred to as "Defendants"), which seeks the following relief:

    (a) to transfer venue of this action pursuant to 28 U.S.C. §1404(a) to the District of New Jersey; and

    (b) to dismiss with prejudice the First, Second, Third, Fourth, Fifth, Sixth, Eighth and Tenth Causes of Action of the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) together with any claim for

1

punitive damages. I am fully familiar with the matters set forth herein.

2. As more particularly set forth in the Complaint ¶11, this case involves a dispute over legal fees between two New York attorneys. The fee sharing agreement at issue in this case was entered into with the individual Defendant, Andrew Dwyer (hereinafter referred to as "Dwyer") on or about June 13, 2013, and subsequently memorialized in writing on June 19, 2013. I entered into the fee sharing agreement in connection with a certain employment discrimination case brought by my client, ▇▇▇▇▇▇▇ (hereinafter referred to as "Client") in the action entitled, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Superior Court Of New Jersey, Hudson County), (hereinafter referred to as the "▇▇▇ Action"). The amount at issue is forty (40%) of legal fees earned in the settlement of the ▇▇▇ Action.

3. Although Defendants' motion as it relates to dismissal is technically directed to the pleading alone, it is important to provide the Court with an accurate sense of my involvement and my contributions to the development and success of the ▇▇▇ Action and as importantly, to correct the many misstatements and false statements contained in the Dwyer declaration dated March 9, 2018, (hereinafter referred to as "Dwyer decl."), and brief submitted in support of the Defendants' motion.

4. At the crux of this case, and as openly acknowledged by Dwyer in his moving papers, Dwyer does not dispute that he entered into an agreement with me to divide the legal fees earned in the ▇▇▇ Action on the basis of a 60/40 split in his favor. Rather, he seeks to disavow the agreement under both New Jersey law and New York law by relying on local rules regulating professional conduct on fee sharing arrangements to avoid an agreement he

2

voluntarily entered into. Significantly, Dwyer's main contention why the fee splitting agreement is not enforceable is because there is no allegation in the Complaint that the client consented to or otherwise acquiesced to the fee sharing agreement. However, Dwyer does not claim that the Client did not consent to it, or otherwise know of the joint representation. In fact, the evidence is probative of the Client's consent to the fee sharing arrangement. Specifically paragraphs (c) and (d) of the settlement agreement divide the legal fees attributable to the attorneys' efforts in the ███ Action with sixty (60%) percent payable to the Defendants and forty (40%) percent being deposited in an attorney escrow account to resolve the Plaintiff's claim. This document was, upon information and belief, signed by ███ and expresses his consent to the fee-sharing arrangement and also the joint representation of Plaintiff and Defendant.

5. The motion to change venue is simply designed to place Defendants in a forum where they believe the court would apply New Jersey law to what is clearly a New York contract dispute because New York law does not permit a member of the bar to use the local rules on attorney professional conduct as a sword for personal gain while breaching a contractual obligation.

## Background

6. I am sole practitioner in good standing admitted to practice in the state and federal courts of New York and maintain a general civil practice engaged in both contentious and non-contentious matters. I have been a friend and lawyer to the ███ family for a number of years. I first got involved in the matter of the claims underlying the ███ Action when I was contacted by Client in or about the end of January 2013 regarding his unlawful dismissal from ███ (hereinafter referred to as "███"). At that time, the Client informed me that he had been terminated from his position at ███ and had been offered a severance

3

package. Client sent me the severance package which I reviewed. Approximately a week later, I met with the Client at my office located at 360 Lexington Avenue, New York, NY 10017 to discuss the circumstances surrounding his employment and termination and the proposed severance arrangements. During the course of our meeting, I determined that the Client had a valid claim for employment discrimination against ▮▮▮ based on a pervasive pattern of harassment and abuse relating to the Client's Jewish heritage and orthodoxy. Attached hereto as Exhibit A, is a copy of the severance package that I reviewed and my notes from my first meeting with the Client. We also entered into a standard New York retainer agreement for a one-third contingency fee. A copy of the retainer agreement is annexed to the Dwyer decl. at Exhibit A.

7. Following my retention, I worked with the Client during numerous telephone conversations, to develop the underlying facts that supported the Client's claim for employment discrimination and the economic damages resulting from his termination. Attached hereto as Exhibit B, is a copy of the Client's summary that was the result of our various conversations. This document set forth the essential allegations for the Client's claims that were ultimately interposed in the Client's Action.

8. On February 27, 2013, I made my first contact with ▮▮▮ by calling ▮▮▮ general counsel ▮▮▮. In that conversation, I gave him an outline of the Client's employment discrimination claim. Mr. ▮▮▮ agreed to look into the matter and call me within a week. Shortly after this first contact, I spoke to the Client to update him on my conversation.

9. On March 7, 2013 I heard from ▮▮▮ outside counsel ▮▮▮. We discussed the merits of the Client's claims and the severance package. I spoke to ▮▮▮ regarding the Client's claim on 4/18/13, 4/22/13, 5/6/13 and 5/8/13. After each conversation, I communicated with the Client as to what transpired and to request further input and instructions.

4

In my last conversation with ████████, he offered to increase the severance package by ████████ to approximately ████████. Based on my prior conversations with the Client, I rejected this offer as completely inadequate.

10. What followed was a series of approximately seven to ten in-depth telephone conversations with the Client, during which we went over the details of his various claims, the negotiations to date, how his discharge from ████ had affected him personally and financially, and strategies going forward. Ultimately, I recommended that the Client pursue an employment discrimination lawsuit against ████. The Client was tentative at first, but ultimately agreed to pursue litigation to fully address the employment discrimination he had suffered.

11. In order to pursue the matter through litigation, I decided it would be prudent to obtain co-counsel, who had more experience in the field of employment discrimination. I contacted a few colleagues and asked for references for employment lawyers. At that time, my focus was to consult with a lawyer that had experience in the field and not necessarily a New Jersey lawyer. I spoke to a few lawyers, including Defendant Dwyer, who was admitted in both New York and New Jersey. On or about June 4, 2013, I spoke with Dwyer and explained the Client's claim. We agreed to meet with the Client at my office on June 13, 2013, at 2:00 PM.

12. On June 13, 2013, the Client, Dwyer and I met at my office in Manhattan to discuss the Client's claims and the possibility of bringing in Dwyer as co-counsel. The meeting lasted approximately two hours. The summary of the Client's claims, which the Client and I had developed, (Exhibit B hereto) served as a guideline for the meeting. Dwyer, in his Declaration, claims that I did not take notes of the meeting and implies I was a passive participant at the

meeting. This is a lie. I did participate actively in the meeting and took extensive notes. Copies of my handwritten notes are attached hereto as Exhibit C.

13. At the end of the meeting, the Client and I agreed to discuss whether we wanted to pursue this matter through litigation with Dwyer. Dwyer, in his Declaration claims that we did not discuss our fee sharing arrangement at my office. This is another lie. After the meeting with the Client, Dwyer and I spoke in my office about the proposed fee sharing arrangement between us. I confirmed that I had a retainer with ▮▮▮▮ for a one-third contingency fee. Dwyer offered to share that fee on a 50/50 basis, but I declined that offer stating that I preferred to defer to his experience and expertise in the field. Instead, we agreed to share the contingency fee, 60% to Dwyer and 40% to me and also because we anticipated that going forward Dwyer would be doing the majority of the work. At that same time, we also discussed the best forum for the lawsuit. Up until that point, I was planning on bringing an action in New York because although ▮▮▮▮ main operations were in New Jersey, ▮▮▮▮ regularly conducted business in New York. However, Dwyer expressed his strong opinion that New Jersey would be a more favorable forum for an employment discrimination case. I agreed to defer to Dwyer as to choice of forum.

14. In the days that followed my meeting with Dwyer, I had numerous telephone conversations with the Client. I discussed with the Client his fears and expectations regarding a lawsuit against ▮▮▮▮ and whether to involve Dwyer in that lawsuit. The Client was concerned as how bringing in Dwyer would affect my fee arrangement with him. I explained to the Client that the fee set out in my retainer agreement, would remain the same, and that Dwyer and I would share that fee between us. Ultimately, the Client and I decided to proceed with the litigation and to retain Dwyer as co-counsel.

6

15.     On or about June 18, 2013, I informed Dwyer of that decision and asked him to proceed with drafting a complaint for filing in New Jersey. On June 19, 2013, Dwyer forwarded to me via email a draft complaint for comment. In that same email, Dwyer confirmed our agreement to share the contingency fee, 60% to Dwyer and 40% to me. A copy of that email is attached hereto as Exhibit D. Dwyer claims in his Declaration, that he explained to me that he could not agree to a "referral fee" since he was not a certified New Jersey trial lawyer. This is another lie. Dwyer never stated in sum or substance that this was a referral arrangement or that he was treating it as a referral arrangement. The first time I heard anything about this aspect of New Jersey ethics, as it pertained to fee sharing arrangements, was when Dwyer made this claim to me at the time the Client's action was settled in or about December 2016, as the justification why he could not pay a referral fee. In fact, when the Client's case was initially settled in December of 2016, I contacted Dwyer to discuss the allocation of legal fees. At first, he expressed surprise claiming he did not recall his own June 19, 2013, e-mail setting forth the agreed division of fees. He asked me to forward to him the email which confirmed our agreement as to the fee split and he would get back to me. When he eventually got back to me, he acknowledged the June 19, 2013, agreement to divide fees 60/40, but he then cited what I now know to be New Jersey Court Rules R 1:39-6. This rule provides in pertinent part, that a New Jersey lawyer may only have a referral arrangement with a lawyer outside of his firm, if in fact, the New Jersey lawyer is a certified trial lawyer. It was this provision that Dwyer initially cited as the basis for his refusal to pay my share of the legal fees.

16.     Thereafter, and much later, Dwyer changed tack and claimed that he was prohibited from honoring the fee sharing agreement based on NJ RPC 1.5(e) which requires that lawyers inform clients of fee sharing agreements and obtain the Client's consent in writing. I

7

asked him why he was refusing to honor our agreement and Dwyer told me that when he thought the case was going to be worth "around a couple of hundred thousand" he would have honored our agreement but was not prepared to do the same now that the fee was so much larger. What Mr. Dwyer does not explain and perhaps understandably given his position, is how, after he entered into a retainer agreement with the Client, Dwyer decl. ¶33, and after drafting the complaint, Dwyer decl. ¶34; and providing the draft complaint to myself and the Client for consideration, he did not provide the Client with the June 19, 2013, e-mail in which Dwyer memorialized our fee agreement. At this point in time Dwyer was acting with the ostensible if not actual authority of our mutual Client in sending the June 19, 2013, e-mail in which the fee division was agreed to. Even though I had discussed the fee splitting in general with the Client the exact percentages had not been discussed. I suspect Dwyer's scheme to usurp the entire fee or almost the entire fee was set in motion at this time.

17. Dwyer also claims, in his Declaration, that I did not comment on his draft complaint. That is yet another lie. On June 20, 2013, I sent Dwyer an email, confirming that I had reviewed the complaint and suggesting the addition of allegations regarding actions of ▇▇▇ in taking away accounts from the Client. In that email, I asked Dwyer to add such allegations to the complaint, but otherwise asked Dwyer to forward the complaint to the Client for his review. A copy of that email is attached hereto as Exhibit E.

18. As the litigation proceeded, I kept in constant contact with ▇▇▇ regarding the litigation. When the New Jersey Superior Court dismissed the Client's Action in favor of arbitration, I had numerous conversations with the Client regarding his desire to conclude the matter via settlement. I actively acted as the Client's liaison with Dwyer at this juncture of the litigation and ultimately decided to withdraw the settlement demand of ▇▇▇ based on

developments in New Jersey law concerning the arbitration agreement signed by the Client.

19. While I did not attend the Client's deposition, I did meet with the Client on several occasions in New York, to go over his anticipated deposition testimony in the case and to prepare him. In fact, I was in constant contact with the Client throughout the litigation and much of my time was spent in answering questions about the litigation to keep him from losing faith in the case. In addition, I reviewed every document in the case that Dwyer and Defendants' counsel sent to me via email and regular mail, including the appeal briefs. As Dwyer himself acknowledged, the agreement was that he would do the majority of the work and there was never any need or plan for me to be admitted pro hac vice or to attend court appearances because the Defendants were actively engaged in the litigation as counsel.

20. Most importantly, I never refused any request from Dwyer to undertake any task or work in connection with the Client's Action. I did not receive one request to do anything from Defendants and as co-counsel in the matter, my role was to convey my legal advice and assistance to the Client, as an attorney he was familiar with from our prior professional and social relationships, to explain the intricacies of the case and proceedings and to prepare him as a witness and advocate. Nor did I receive any complaint or criticism from Dwyer during the ▬▬▬ Action that I was not participating in the joint representation. I did continue, through the time that settlement was being discussed in earnest to advise and counsel the Client on all aspects of the settlement proposal.

21. I respectfully submit that the Defendants' motion to change venue and for partial dismissal be denied with respect to the first, second, fourth, fifth and eighth causes of action. I intend to serve an Amended Complaint pursuant to the time set forth in Fed. R. Civ. P. 15(1)(B) which omits the third, sixth, seventh and tenth causes of action and amends the first, second, fourth, fifth and sixth causes of action.

Dated: New York, New York
March 23, 2018

Alan A. Tarzy